Case 23-2051, Fair Housing Ctr of Metropolitan Detroit v. American House Grosse Pointe et al. Argument not to exceed 15 minutes per side. Counsel, you may proceed for the appellant when ready. Good afternoon, Your Honors. My name is Andrew Raczynski and I represent the appellant, Fair Housing Ctr of Metropolitan Detroit. And I am requesting three minutes for the rebuttal. Fine. Thank you, Your Honors. Your Honors, this case asks whether a housing provider can categorically refuse to even consider providing American Sign Language interpreters for prospective deaf residents. The court's grant of summary judgment to American House fundamentally misapplied both the Fair Housing Act and this court's precedent. The record shows three key facts. First, when our tester asked generally about accommodations for her deaf grandmother, American House Executive Director Anne Sadler responded with an absolute refusal, stating, As a traditional landlord, we don't provide care that way. We don't provide that service. And American House never affirmatively indicated it would provide any accommodations or ASL services under any circumstances in that interaction, even when necessary. Third, American House failed to train its staff on accommodating deaf residents and had no process for considering such accommodation requests. The Supreme Court in FDA v. Alliance for Hippocratic Messing recently declined to extend Haven's realty beyond its fair housing context. And our case falls squarely within Haven's core holding about direct interference with its core business activities. Let's talk about that. What is your core business? Do you have actual clients?  Do you place people in housing? Yes. And where would I find that in the record? So if you look at our annual reports, it will show all the business activities. That's in the record? Yes. Okay. If you look at our annual reports, you'll also look at the depositions of Tom Koviak, as well as you'll find that also in various articles of incorporation that we referenced in our brief. So it shows our core business activities dating back from the 70s. So you, like people might come to you, you're sort of like a broker, an unpaid broker. Like if you need an apartment in New York, you need an apartment broker, right? So I need services for a disabled relative or for myself to move into senior living. I come to you, you're like a clearinghouse broker, except I don't pay you. No, this is a fair housing center, which is specifically, they provide various services. They provide counseling. They provide advocacy. What does counseling mean? I understand the advocacy. I understand the litigation. I'm trying to figure out whether you're like a nonprofit in home versus Havens Realty. So sometimes people will call and ask about, I'm having trouble getting accommodations here. Do you have resources or I'm looking for housing? Can you provide resources on where I can get housing? So like a list, and then you can say like, oh, these apartments, or yeah. So they're not like a real estate broker by any means, but they do provide referral services to the appropriate resources in which they can place them in various different kinds of housing settings. And that's something that they've done, for instance, over the last three years, over 750 times. So it's not something that's ancillary. You're providing, so if I needed, if I were hearing impaired and I needed to move into senior living, I could come to you and you would give me a list of places that would accommodate my needs, or you would help, you would call the places for me? So that's something that they could do. Is that something that your business does? Yes. Okay. Yes. So materials that you sent us to would show this, the deposition of a particular individual, the annual reports, the articles of incorporation. Is there anything else that you would point us to to show that? In terms of what's in the record, no. That would be primarily the areas, the deposition transcripts, the annual reports, the articles of incorporation. After reading the recent Supreme Court case in Hippocratic Medicine, would there be a need to remand this case to have further development of the factual record to show that you are within the Havens Realty exception in the Alliance for Hippocratic Medicine? So that case actually specifically stated that it's not extending the Havens ruling beyond its fair housing context. So while it could apply to outside of the fair housing context, it does not apply to the fair housing context. And FDA specifically states that in its ruling. So you think that as long as you're operating under the Fair Housing Act, all of your activities like posting advertisements saying this particular senior living facility discriminates against disabled people, that would give you standing or just merely filing a lawsuit because you're under the Fair Housing Act? No. Okay. So the Sixth Circuit has very well-developed case law post-Havens regarding that. Post-Havens, but not post-Alliance for Hippocratic Medicine. Right. And what I'm saying is that that does not change at all. Okay. So why is that? Because in Alliance for Hippocratic Medicine, they carved off a bunch of what would have applied under our case law. And I think your argument is no, not if you're under the Fair Housing Act. If you're under the Fair Housing Act, you're good. All those things still apply. So, well, I'm saying if we're under the Fair Housing Act, we're definitely good. But in terms of what FDA stood for was you can't have an issue regarding the government, for instance. So this is under the APA versus the Fair Housing Act. And so basically what it was doing, it was challenging Mithoprestone and regulations regarding that. These were lawful regulations that were implemented, and they were trying to get an injunction. I understand the case. Right, right. So you could have a policy disagreement about a lawful action that the government is taking, but you can't spend millions of dollars and then claim standing. You have to have a direct injury. Right. And so the question is how are you injured? So you get a grant from the federal government. The federal government tells you you must do this testing. You do the testing. You spend the grant money to do the testing. And they gave you truthful information, and you say you're injured. So they didn't give truthful information. Really? Yes. So when they said we don't provide these services, that's the basis for your lawsuit. If they were lying when they said we don't provide the services, then you don't have a case. So they said as a traditional landlord, in response to do you provide accommodations, as a traditional landlord, we don't provide accommodations. Traditional landlords under the FHA have to provide reasonable accommodations to people with disabilities. So if they are saying as a traditional landlord, we don't have to do that, that's a lie. That's false information. That's just about their legal obligations. That's not a factual question. That's their misunderstanding of the law. So in Havens, they sent testers. Yep. And in Havens, the... The landlords lied. They said we don't have any apartments. Sure. Because the clients were black. So they were lying. They said we don't have any apartments. When the white people show up, they're like, oh, I've got a ton of apartments. Let me show them to you. That's a lie. So what if they said as a traditional landlord, we don't provide residences to African Americans? Why is that different than a context as a traditional landlord? We don't provide accommodations for people with disabilities. They're telling you the truth that they don't do that. They're violating the law, but they're not lying. So if they know that as a traditional landlord, they have to provide generally accommodations, which they said they did in their deposition. So the whole point about them giving you misinformation is this precatory statement, the predicate. As a traditional landlord, that's what you think misled you. That's a false statement.  And so... Arguably, in the Hippocratic Oath case from the Supreme Court, they said that the Havens case was distinguishable because Holmes sued Havens because Havens perceptively impaired Holmes' ability to provide counseling and referral services. Right. And is your position that you also provide counseling and referral services so that you are squarely within the area of Havens that was separately dealt with in Justice Kavanaugh's opinion? We are squarely within there. But regardless, FDA did not say that unless you have identical facts to Havens, you no longer have standing under Havens. All it said was that in the context of the APA and in this suit where there's no direct injury, here we have a direct injury. We have discrimination. Just like in Havens. But you have to be injured. Well, the Fair Housing Organization is injured. How? How was the Fair Housing Organization injured in Havens? Because they're trying to place people in apartments. They have clients. Some of their clients are African American. When they call Havens Realty and say, hey, do you have any apartments? They say, no, I don't have any apartments for your clients. So they have to go spend their money to find other apartments for those people. So they can't place as many people in apartments. Right. So we're trying to figure out if that's what you do for disabled people. So if someone calls now and says, I want to go to that facility, we now can't say that they'll accommodate you because they've been told that they're not going to accommodate. Because as a traditional landlord, they don't provide those services. So you would have to go for your tester. You would have to go to some other assisted living place so that your tester's grandmother or brother, you had three testers, could find housing. Right. Exactly. So in the FDA cases and all the other cases, no direct injury. Discrimination is defined as an injury, in fact, as a tort. It's been recognized. So when you injure somebody, unlike in the other cases where there is no traceability under FEHA, you can spend all the money you want and never get standing because you're not directly injured by the conduct. But here we are just like in Havens. Any further questions? You'll have your rebuttal time. Good afternoon and may it please the court. My name is Salvatore Amadeo and I represent the American House Defendants in this case. I want to get into the facts in a second because I feel like they were, if the court read the facts, were not represented accurately. But before I get into that, the central issue or the two big issues are standing in the Fair Housing Act in this appeal. We asked the court to affirm the district court's entire dismissal of this complaint. And I want to point the court to the Fair Housing Center's opening brief, which entirely admits that this is a lawsuit to perpetuate their claim for damages for diversion of resources and frustration of mission. And if you look at page 9 of their brief, Fair Housing Center, Metro Detroit states, Fair Housing work must be proactive, not reactive, to ensure that everyone receives equal treatment at nursing homes and assisted living facilities the exact moment they need it. That right there, that therein admits that this was a lawsuit that was perpetuated through investigation without any type of prior complaint or prior issue. And there's no actual damages to the Fair Housing Center other than their claim for diversion of resources to investigate. To look into the law, to hire testers, to enlist these testers to go to American House and then file the lawsuit. Now it was represented that the Fair Housing Center engages in counseling and referral services. And it's American House's position that after the FDA case, a Fair Housing organization must be able to prove that they have a direct injury to their core business activities. But the particular passage that I was reading from the Hippocratic case does say that the key was providing counseling and referral services. So would you agree that if that was part of Fair Housing Center's mission, that they were providing counseling and referral services to people, here we're dealing with deaf people, for people who were deaf trying to find assisted living. Would that be enough then to establish standing? I would admit that's enough. Adding on the additional caveat, that has to be part of their core business activity. It can't just be something that they do. And if you look at the reports that the Fair Housing Center cites to, they're more so one-off anecdotes. This isn't a core business activity that they engage in. And I can point to the record a number of instances. The complaint never states that they have damage to their counseling or referral services at any time. That's 83-1. Their discovery responses, 83-25, never ever states counseling or referral services. The only damages that they provide in those discovery responses are diversion of resources and frustration of mission. So assuming that you're correct, all of this happened, if I'm correct, tell me, or incorrect, tell me. All of this discovery and complaint writing happened before the decision of the Supreme Court in the summer of 2024. Correct. Yes. Because the appeal took a little while to get through. So should they have an opportunity to amend? Should we send it back to the district court and say, here's a new case from the Supreme Court, may have changed what the plaintiffs should have been alleging, and so let them amend the complaint to reflect the new law? Sure, Your Honor. Two responses to that. The first being it will garner no additional facts that prove that they carry on those counseling and referral services. And then the second being that they still fail under the Fair Housing Act and the Michigan equivalent civil rights statute. So the first being... Right, but we can't just skip over the standing question. Even if we thought you were right on the merits, we can't skip it. Okay, so I deposed the Fair Housing Center's corporate representative. And at page 1941 through 1954, I went through every potential damage that the Fair Housing Center had in this case. And I asked him very intricately, what are you claiming? This is what your discovery responses say. And at the end of that line of questioning, I said, have we talked about all of the damages that you're claiming in this case? The answer was yes. Never again. If this was a part of their core business activity, if this was such a significant part of their business or their mission that they did this, then it would certainly have come out and been vetted out throughout all of that process. Written discovery, the complaint, and then deposition of their corporate representative. That never happened. So to send this back down to the district court to allow additional discovery I think would be futile. And I'd like to add to that that the document that the Fair Housing Center is pointing to to claim their damages is a report that was not produced by the Fair Housing Center to claim damages. It was not attached to their response to my MSJ. I pulled that from the Internet. Annual report? Yes, the two annual reports. I pulled that report from the Internet. I attached it to the deposition of the Fair Housing Center's corporate representative. I questioned him about it. And then I attached it to the motion for summary judgment to show that they are entirely grant funded. At no point was it ever introduced that it showed that the Fair Housing Center engages in counseling and referral services. This is simply an attempt to put themselves within a box that aligns with the FDA case and the Supreme Court precedent that came thereafter. There's nothing separate from... There's no injury to the Fair Housing Center and that's the big thing. In order to be an aggrieved person under the Fair Housing Act, the Fair Housing Center has to be an aggrieved person under 42 U.S.C. 3616A, 3602A, and 3603. At no point in the Fair Housing Act does it state that a Fair Housing Center such as the FHC is an aggrieved person. The only case that has ever extended that to a Fair Housing organization is Havens. And again, after FDA, the Supreme Court now limited Havens' application to requiring a core business activity of being injured. That is not present anywhere in this case and additional discovery will not show that. So if hypothetically a housing center had two different lines of business, one was to be a referral service and the other was to be a testing agency to see what kind of discrimination there is in the neighborhoods. And they were equal. Would that constitute a core business that they had this referral business? To be core, I think it has to be majority. So 50-50, I would say no if we're trying to quantify it. Certainly, the alleged housing counseling and referral services in this case doesn't reach anywhere near a core business activity because the claim damages in this case include an opportunity cost argument. That because of the American Sign Language program that the Fair Housing Center instituted, that they were unable to do other things. Those other things were not counseling and were not referral services. They were another testing program against Redfin, the website, the real estate website. Right, yes. So when they said they diverted their resources, that's what their answer was. Well, we had to pursue this lawsuit so we couldn't do testing on Redfin. When I look at the report, it looks like in the 90% of what they do is testing. And they're entirely grant funded through HUD grants and CBDG grants to conduct this testing. That, to me, is their core business activity, the testing. And after FDA, in addition to this court's ruling in the Tennessee Conference of the NAACP v. Lee, education initiatives, information gathering, all of those things that the Fair Housing Center is claiming in this case are no longer sufficient to confer standing under Article III of the Constitution. If the court has any other questions on standing, I'd be happy to answer them, but I would like to address the Fair Housing Act very quickly. So there's three tests in this case. In each test, the question was posed, do you have an American Sign Language interpreter on staff? The Fair Housing Center, their director, and the director of their testing admitted a number of times, and that's pronounced throughout my brief, that that is not required. An American Sign Language interpreter on staff or available 24-7 is not required. So the majority of the questions in their test ask for an accommodation that's neither reasonable nor necessary. The first test was simply a 40-minute long in-person test in which the tester walked through the entire facility with an American House representative, at one point said, oh yeah, the relative that I'm here for is hard of hearing and they're going to need ASL, do you have one on staff? The answer was, I don't think so, I'll get back to you. That was the extent of it. That's not a rejection, that's not showing that the Did they get back, did your client's person get back? We have, I attached it to the motion and to the brief, that there was a communication in which that person reached back out to the tester from the Fair Housing Center and indicated, we don't have one on staff, but you could come back in for lunch and we could see if we could accommodate or bring your relative in. Test two is the one that the Fair Housing Center seems to take issue with, but test three is the last test in the line, took place two months after test two. And in that test, again it was asked, do you have an American Sign Language interpreter on staff? And the response was, I'll get back to you, but we have other people with other disabilities, we provide specialized accommodations for them and we'd be happy to provide those for you. Again, not a rejection. Test two, it appears that the tester and the representative from the American House were miscommunicating, because the initial question on the phone was, do you have an American Sign Language interpreter on staff? The response was, I'm not sure, but let me get my director for you, I know we do many interactive things for our residents. In discovery, through depositions, it was shown that American House accommodates hard of hearing individuals or residents through picture boards, whiteboards, lip reading, and closed captioning on TVs. That was never questioned, that never came out in the test, it was never rejected, that these other interactive things would not accommodate this fictitious relative that was not present during the test. Then there was a question, do you have an American Sign Language interpreter on staff? To the executive director, the response was, we don't do that here as a traditional landlord, I don't know where you'll find that. We can't guarantee we'll have an American Sign Language interpreter on staff all the time. Her interpretation, and the district court's interpretation, of that question was, are you requesting an American Sign Language interpreter on staff 24-7? Again, nowhere in this country will you find a case stating that a living facility has to provide an American Sign Language interpreter 24-7. It simply doesn't exist. I've cited two cases in other districts, including Silva v. Baptist Health, South Florida, Inc., an 11th Circuit case from 2020, in which the 11th Circuit said that effective communication does not mean that deaf patients are entitled to an on-site interpreter every time they ask for it. Similarly, in Baxby Doctors' Medical Center of Modesto, a 9th Circuit 2022 case, the court said that there's no categorical rule for requiring an American Sign Language interpreter on staff or at all. So is your basic position then that the testers did not proceed past that initial question, do you have an ASL interpreter on staff 24-7, to say further details about their hypothetical relative that would lead to the back-and-forth kind of accommodation inquiry between the tester and the American home people? Yes, Your Honor, and just to be clear, the Fair Housing Act doesn't require the interactive process, and that's kind of what you're alluding to, the ADA. Yes, the ADA requires that, the Fair Housing Act does not. But yes. What does the Fair Housing Act require in terms of an accommodation then? To provide an accommodation that's shown to be necessary and reasonable, and so that necessary requirement means that the individual asking for that accommodation has to show that it's indispensable or essential. And the case that I cited to primarily in my brief is Kuhman v. Boulder Bluff, and that's a case that pretty well outlines the issue, that enough information has to be provided to the living facility in order to show that it's necessary, and that means the living facility has to be provided with an ability to have a meaningful review to make a decision. That was never achieved in this case. Because there's no client. We don't know what the particular disabilities of these people are because they're entirely fictitious. Yes, they're fictitious, they're not living, they're not breathing. But they could have a fictitious person with a full range of issues that they present, just the way you can have an actor. They could have done that, and I believe that goes back to the standing issue, that there was no individual that's hearing disabled or hard of hearing waiting in the wings, waiting to be placed at American House or anywhere else. That person didn't exist. To get a true idea of what a hearing impaired person required, Fair Housing Center initially started their test, but then halfway through they went to a deaf organization, a deaf advocacy organization, to vet questions out of them and get questions out of them as to what their test actually should be asking. The test was changed, but the testers never followed that test. But the important thing is they didn't have a living, breathing person waiting in the wings, and that person was injured because they weren't able to be placed at American House, which again goes to Article III standing. And what's your best case for saying there has to be a living, breathing deaf person in order for there to be a claim here at all? For standing, it goes to causation, it goes to traceability. I'm asking for a case. Do you have a case? You know, you were saying there are no cases are saying that you have to have an ASL interpreter, and you were starting to cite cases, and I'm asking is there a case that says you have to have a living, breathing person as opposed to a tester who has a range of issues with hearing? I would just point to the Fair Housing Act that requires an aggrieved person. And I don't believe an aggrieved person can be a fictitious person that's not on site. And I don't believe that you can connect that to a person that's a tester that's acting as the relative of a fictitious person, and again claim an injury under the Fair Housing Act. So there's no direct case that says an off-site fictitious person can't have standing. I believe it almost reached the Supreme Court and I believe it was Atchison Hotels that if the person never intends to actually utilize the facility that they don't have standing, clearly a fictitious person that's off-site with their relative representing them, it's two layers of unintention. If the court has any other questions, I'd be happy to answer them. But I'd ask for the court to affirm the district court's dismissal of this case. Thank you. Thank you. First I want to correct some misstatements made by counsel. The FHA statute permits any person, any aggrieved person to bring a housing discrimination suit. And it defines an aggrieved person as any person who either claims to have been injured by a discriminatory housing practice or believes that such an injury is about to occur. And if you look at the Bank of America, the City of Miami Supreme Court case, it actually talks about extensively that organizations such as the Fair Housing Center does have standing as an aggrieved person when it is injured by a discriminatory housing practice or believes that such an injury is about to occur. And the injury here is the statement. Any aggrieved person is about prudential standing, correct? What we used to call prudential standing. Whether there's cause of action. Not about Article 3. Sure. And I know your opposing counsel brought that up. And we have standing to the limits of Article 3 according to the Bank of America case. And the Supreme Court in Havens and all of the Sixth Circuit precedent has recognized that fair housing organizations have standing when they uncover a discriminatory practice, statement, activity. And they do things such as advertising, education, outreach to counteract that discrimination. So you're still resting on the advertising, outreach, all of those kinds of things in order to support your standing? I just feel like Alliance for Hippocratic Medicine counsels against that. So again, I would ask that that case be reviewed. It says nothing that, one, it's overturning Havens. That it's confining Havens to its factual context. It actually supports our case and says that we are outside of the fair housing context is what we're talking about here and leaving the Havens precedent in place. And so it's actually for the proposition, if you look at it closely, that nothing about Havens and the preceding precedent has changed in the fair housing context. And so that's... If we thought that was wrong and that you needed to show that your core business included counseling and referral, if we thought that's what Alliance for Hippocratic Medicine means... Judge Moore asked you if you'd like a remand. And I didn't write down what the answer is. So I'm just interested to ask you again because I didn't write down the answer.  If we need more facts to flesh out our injuries, that's fine. We can get... We would certainly welcome a remand in that matter. But what I'm saying is, if you look at all the precedent that's been post-FDA, it is not in the fair housing context whatsoever. If you look at cases like Mays, NAACP, all these other cases, these are cases where there is no injury and there were cases in where they were having a policy objection to valid laws that were passed. While here, there was actually injury by uncovering discrimination because what the Fair Housing Center wants to do is to ensure equal housing for all in metropolitan Detroit. They've been doing so for over 50 years and all their core missions that we're stating have been affected are not something we just came up with recently. They've been core missions for over 50 years. And so these are bonafide core business activities. And so what I would urge this Corps is to look at FDA closely. Look at the precedent that has applied FDA afterwards. And you will see very clearly that in those cases, there are traceability and regessibility concerns. And there are lack of injury to the organization concerns. And so if HAVENS is in place, if we accept that the statement made in FDA that we're confining HAVENS to its context of fair housing cases and therefore all fair housing case law is intact, then all the Sixth Circuit case law that talks about when a fair housing organization uncovers discrimination and diverts its resources by doing additional testing, by doing education and outreach, by doing advertising, it has an injury. And in our brief, we cite Supreme Court cases that says that the Supreme Court, unless it expressly states that it's narrowing or overturning prior precedent, that you should not assume or speculate that a dicta in terms of fair housing in its context overturns all the case law that HAVENS applies in the Fair Housing Act. Thank you. Thank you. Thank you both for your argument. The case will be submitted.